UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
───────────────────────────────────────────────

AMICA MUTUAL INSURANCE COMPANY
as subrogee of KERI STETSON,

                            Plaintiff,

                            v.

ELECTROLUX HOME PRODUCTS, INC.,

                            Defendant.
───────────────────────────────────────────────

DECISION AND ORDER

16-CV-6845L

      Amica Mutual Insurance Company ("Amica"), as subrogee of homeowner Keri Stetson ("Stetson"), brings this action seeking coverage for fire damage Stetson's property which was allegedly caused by a defective clothes dryer manufactured and marketed by defendant. Defendant now moves to exclude the testimony of plaintiff's expert witness, Arthur Bronstein, and for summary judgment dismissing the complaint, on the grounds that there are no material facts in dispute and that the plaintiff cannot, as a matter of law, establish its claims. (Dkt. #25). For the reasons discussed below, the motion is granted.

**FACTUAL AND PROCEDURAL BACKGROUND**

      On December 14, 2015, a fire broke out in or near a gas clothes dryer (the "subject dryer"), manufactured by defendant in 2008, at Stetson's residence in Webster, New York. The dryer had been owned and used by Stetson for approximately seven years at the time of the fire.

      The plaintiff thereafter commenced the instant action, requesting compensatory damages of $261,266.00. (Dkt. #1 at 9). Plaintiff claims that the defendant is liable for damages on

theories of negligence and strict liability (stemming from the subject dryer's allegedly defective design, defective manufacture, and failure to warn), and breach of warranty.

## DISCUSSION

I. **Admissibility of Expert Testimony**

In support of its claims that the subject dryer was negligently designed and/or that defendant failed to warn consumers of the defect, plaintiff proffers the testimony of Arthur Bronstein ("Bronstein") as an expert. Bronstein is expected to testify concerning his observation of evidence of electrical arcing (the flow of electricity through air between two conductors) inside the subject dryer, his theory as to a possible defect that could have caused the arcing, and his theory concerning the arcing activity itself as a potential cause of the fire.

The admissibility of expert testimony is primarily governed by Fed. R. Evid. 702, as illuminated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Determining whether to admit a proffered expert's testimony is a two-step process: first, the Court must ensure that the witness is, by "knowledge, skill, experience, training or education," sufficiently qualified as an expert to testify about matters that are scientific, technical, or specialized in nature. *Almonte v. Averna Vision & Robotics, Inc.*, 128 F. Supp. 3d 729, 739 (W.D.N.Y. 2015). Second, the Court must find that the expert's testimony will assist the trier of fact to understand the evidence or determine an issue of fact. *See Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001). Ultimately, whether expert testimony is admissible is a question of law which rests solely within the broad discretion of the trial judge. *See Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 234 (E.D.N.Y. 2014).

With respect to qualifications, Bronstein has a degree in broadcasting and an engineering license, and has operated two electrical repair businesses. He is a New York State Level 2

certified fire investigator, and testified that he had prior experience testifying in dryer fire cases, one of which involved testing a particular Whirlpool dryer and its components. Bronstein's knowledge and experience center around electrical engineering and repair, as well as fire investigation. On balance, the Court finds that plaintiff has established that Bronstein is sufficiently qualified to render opinions related to fire originating in or from an electrical appliance. *See generally Lara v. Delta Int'l Mach. Corp.*, 174 F. Supp. 3d 719, 732 (E.D.N.Y. 2016) ("totality" of proffered expert's experience in a general field renders him qualified to render an opinion, and his lack of specific familiarity with a product may go to the weight of his testimony, rather than to its admissibility).

Having found that Bronstein is qualified to render an expert opinion based on the totality of his background, the Court turns its attention to the question of whether Bronstein's proffered testimony is reliable, and will be of assistance to the trier of fact in evaluating the evidence in this case. In making that determination, the Court is guided by the factors set forth in *Daubert*, 509 U.S. 579 at 592-93.

*Daubert* set forth a non-exclusive list of facts that may be considered in assessing the reliability of expert testimony. These include: (1) whether a theory or technique could be, and has been, tested; (2) whether it has been subjected to peer review; (3) its error rate; and (4) its degree of acceptance within the relevant scientific community. *See Daubert*, 509 U.S. 579 at 593-94. These factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 at 141 (1999). In keeping with these principles, the Court should exclude expert testimony that is "speculative and conjectural." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996).

3

Plaintiff offers Bronstein's testimony in an effort to demonstrate the existence and nature of the alleged defect in the subject dryer. Bronstein testified at his deposition that when he examined the subject dryer after the fire, he noted evidence of electrical arcing in several locations. Bronstein theorized that "a wire or two wires or several wires were exposed over time to either vibration or heat [and] became damaged physically [and then came] into contact with an unintended . . . ground or other pole," which led to the electrical arcing, generated heat, and eventually ignited the wire insulation and/or accumulated lint inside the dryer. (Dkt. #25-9, Bronstein Deposition at 26:23-27:12, 31:20-32:1).

Under cross-examination, Bronstein admitted that he had never examined or tested any dryers of the same make and model as the subject dryer to determine whether vibration and/or heat would actually have affected the internal wiring, and had not tested the insulation material used in the dryer to identify its composition or determine how it performed when exposed to vibration and/or heat. In fact, Bronstein testified that his inspection of the subject dryer took place only after its internal components had been heavily damaged by fire, and after the dryer had been moved by firefighters, which further dislodged some internal components and wiring. As such, Bronstein was not aware of the original location, function, or means of attachment for the electrical conductors on which he testified he observed signs of electrical arcing, and which he hypothesized might have detached during normal operation of the dryer. Bronstein also testified that despite his hypothesis that electrical arcing caused the fire, he could not identify any reliable method for distinguishing between arcing that *causes* a fire, and arcing that *results* from a fire that has spread from elsewhere.

The Court notes that the testing of hypotheses is considered the hallmark of reliable scientific methodology. Despite the fact that other dryers of the make, model and vintage of the

4

subject dryer might have been examined or used to gain information about the dryer's original configuration and/or to test Bronstein's theories, no attempt at such examinations or testing was evidently made. Bronstein's hypothesis – that wires *may* have been improperly installed or insufficiently well-attached, that vibrations or heat within the dryer *possibly* caused insulating material to detach from the wiring, that these conditions *might* have caused electrical arcing to occur, and that electrical arcing *could* have caused the wire insulation and/or lint within the dryer to catch fire – remains entirely speculative.

In summary, Bronstein has no knowledge, whether gained by scientifically rigorous examination or testing of similar dryers, or through the review of peer-reviewed studies or documentation, concerning the subject dryer's condition and configuration at the time it was designed and/or manufactured, or the type and characteristics of the wire insulation and/or wiring fasteners that are central to his theory. He has not conclusively identified a specific defect in the design or manufacture of the subject dryer, or pointed to a safer alternative design. Rather, Bronstein's proffered testimony is comprised of a series of conjectures, untested and unverified by scientific testing or professional literature, about the design, location, configuration, installation, condition, performance and qualities of certain electrical components within the subject dryer. His opinion lacks a sufficient grounding in scientific testing and methodology which not only erodes its weight, but falls short of plaintiff's burden to demonstrate its admissibility. *See Lara*, 174 F. Supp. 3d 719 at 737 (excluding proffered expert witness's testimony where his "ultimate conclusions are bottomed upon nothing more than mere speculation and guesswork, which are a less than adequate basis to support [his] position – especially since performing detailed studies and tests represents the touchstone of what an engineering expert in a design defect case should do") (internal quotation marks and citations omitted).

As such, I find that plaintiff has failed to meet its burden to demonstrate that Bronstein's opinions concerning the existence and nature of the alleged defect in the subject dryer, or for that matter the existence of a safe alternative design (a subject Bronstein specifically testified was not his role to address), have sufficient indicia of reliability. On that basis, the Court is constrained to preclude his testimony. *Compare Allstate Ins. Co. v. GE*, 2002 U.S. Dist. LEXIS 28256 (W.D. La. 2002) (excluding expert proffered to testify as to manufacturing defect that allegedly caused dryer fire, where he never inspected the subject dryer, never worked in the field of dryer design, engineering, manufacturing, or testing, was unable to determine precisely where the defect was located beyond speculating that a dryer control system manufacturing defect must have cause the dryer to overheat, had never inspected a dryer of the make, model and vintage of the subject dryer, and had never scientifically tested any of his theories on any dryer, and did not know the makeup of the internal wiring system or other dryer components of the subject dryer) *with Am. Family Mut. Ins. Co. v. Electrolux Home Prods.*, 2014 U.S. Dist. LEXIS 86880 (W.D. Wis. 2014) (permitting expert to testify as to manufacturing defect and failure to warn, where the expert had specialized knowledge in fire analysis including dryer fires, had examined and test-run more than 500 Electrolux dryers, had authored 80 reports on them, had attended 60 hours of training courses related to appliances, and extensively reviewed product literature for the subject dryer); *Auto Ins. Co. of Hartford., Conn. v. Electrolux Home Prods.*, 2012 U.S. Dist. LEXIS 180396 (S.D.N.Y. 2012) (permitting expert to testify that dryer fire was caused by a design defect, where the expert tested 41 dryers of the same make and model, and cited numerous scientific studies); *State Farm Fire & Cas. Co. v. Electrolux Home Prods, Inc.*, 2012 U.S. Dist. LEXIS 188434 (N.D. Ind. 2012) (permitting expert to testify concerning design defect and failure to warn, where the expert had ten years of experience researching dryer fires, had studied the subject dryer as well as other exemplars

of the same make and model, had dismantled and examined hundreds of similarly-designed Electrolux dryers as well as dryers from competitors, and had reviewed user's guides, installation instructions and service manuals for the subject dryer).

## II. Summary Judgment

Summary judgment will be granted if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In determining a motion for summary judgment, the Court's role is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. When considering a motion for summary judgment, the Court must construe all inferences from underlying facts in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986), *citing United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The Court need only consider admissible evidence in adjudicating a motion for summary judgment. As such, "the trial court should not consider testimony of an expert it has found to be unreliable in evaluating a motion for summary judgment." *Hilaire*, 54 F.Supp. 3d 223 at 251.

### A. Negligence and Strict Liability Claims

Plaintiffs have alleged claims for defective design and/or manufacture based on theories of negligence and strict liability. Under New York law, both require the same initial *prima facie* showing. *See Jarvis v. Ford Motor Co.*, 895 F. Supp. 2d 398, 415-16 (2d Cir. 2002). Specifically, plaintiff must prove that defendant breached its duty to market safe products (by marketing a product that was defective, in that it did not have a reasonably safe design, or was not properly manufactured), and that the defect was an actual and proximate cause of plaintiff's injury.

7

*See Voss v. Black & Decker Mfg. Co.*, 59 N.Y. 2d 102, 107 (1983).  In proving the existence of a design defect, plaintiff must present evidence "that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner."  *Id*.  Defendant may rebut this evidence by showing that the product is safe – that is, that its utility outweighs its risks, and that the product's design reduces the risks to the greatest extent possible to retain its inherent usefulness.  *Id*.  Whether a product is defectively designed such that its utility outweighs its dangers is generally a question of fact for the jury.  *Yun Tung Chow v. Reckitt & Colman, Inc.*, 17 N.Y.3d 29, 33 (2011).

The elements of a manufacturing defect claim are similar.  Plaintiff must prove: (1) a defect which existed at the time the product left the defendant's control, due to an error in the manufacturing process; (2) a causal connection between the defect and the injury; and (3) damages.  *Angona v. City of Syracuse*, 118 A.D.3d 1318 (4th Dept. 2014).  "Explained another way, a manufacturing defect exists when the unit in question deviates in quality and other performance standards from all of the other identical units."  *Cavanagh v. Ford Motor Co.*, 2014 U.S. Dist. LEXIS 68504 at *9 (E.D.N.Y. 2014).

Defendant argues that plaintiff's negligent design and/or manufacturing claims must fail, because plaintiff has failed to put forth any evidence, supported by competent expert opinion, concerning the existence of any design or manufacturing defect in the subject dryer, or with respect to an alleged design defect, the feasibility and efficacy of an alternative design.

The Court agrees.  Initially, it is manifest that the design and manufacturing of dryers and the potential for various internal wiring and heating components and internal debris to create a fire hazard are subjects beyond the ken of the average juror.  Nonetheless, plaintiff has failed to produce admissible expert testimony to establish the existence of a defect.  *See generally Frazer*

*v. ITW Food Quip. Grp. LLC*, 2013 U.S. Dist. LEXIS 166599 at *19 (S.D.N.Y. 2013) (a "party cannot survive summary judgment on a design defect claim without admissible expert testimony").

Furthermore, plaintiff cannot rely on generalized allegations of the existence of a defect, since alternative causes of the fire, such as incorrect installation or failure to provide proper maintenance, have not been ruled out. To the contrary, defendant offers the report of its engineer Randall Bills – the admissibility of which has not been challenged – who testified that the fire resulted from the ignition of accumulated lint near the dryer's burner assembly, and that the lint accumulation was itself the result of the dryer having been improperly installed, and/or not maintained by its owners in a manner consistent with the manufacturer's instructions. *See Riegel v. Medtronic, Inc.*, 451 F.3d 104, 125 (2d Cir. 2006) (to proceed with a defect claim based on circumstantial evidence of a defect, plaintiff "must prove that the product did not perform as intended *and exclude all other causes for the product's failure* that are not attributable to [the manufacturer]") (emphasis added).

Indeed, even assuming *arguendo* that plaintiff was able to demonstrate the existence of a defect, plaintiff has produced no admissible evidence concerning the subject dryer's deviation from others of the same make and model (for purposes of its manufacturing defect claim), or concerning the existence or efficacy of an alternative design (for purposes of its design defect claim).[1] As such, plaintiff has failed to make out a *prima facie* case on its negligence and strict liability claims, and those claims must be dismissed.

---

[1] The expert reports submitted by plaintiff, authored by Bronstein and by Timothy Doyle (a fire investigator who ruled out arson, accident, and hot objects as potential causes of the fire), make no mention of a safer alternative design. Although Bronstein commented that the use of "limited number" devices and additional wiring fasteners at his deposition might have prevented the fire, these suggestions were entirely speculative, and Bronstein maintained that it was "not [his] job" to propose safe alternatives. (Dkt. #25-9 at 64).

9

B. **Negligent Failure to Warn**

Defendants urge that plaintiff's negligent failure to warn claim must likewise be dismissed, since plaintiff has failed to demonstrate the existence of a defect that would trigger such a duty, or to demonstrate that a defect was the proximate cause of the fire.

A failure to warn claim requires proof that the manufacturer failed to provide adequate warnings regarding the risks and dangers accompanying the use, or foreseeable misuse, of its product. *Sorto-Romero v. Delta Int'l Mach. Corp.*, 2007 U.S. Dist. LEXIS 71588 at *29 (E.D.N.Y. 2007). The adequacy of a manufacturer's instructions and warnings "is generally a question of fact to be determined at trial and is not ordinarily susceptible to the drastic remedy of summary judgment." *Urena v. Biro Mfg. Co.*, 114 F.3d 359, 366 (2d Cir. 1997). Nonetheless, plaintiff retains the burden to prove that the absence of an adequate warning was a proximate cause of his or her injury, and a Court may dismiss failure to warn claims where the hazard is open and obvious, or where there is no evidence that additional warnings would have added to the consumer's appreciation of the risk. *See Ramos v. Simon-Ro Corp.*, 2008 U.S Dist. LEXIS 68814 (S.D.N.Y. 2008); *Anderson v. Bungee Int'l Mfg. Co.*, 44 F. Supp. 2d 534 (S.D.N.Y. 1999).

Here, plaintiff offers no expert opinion concerning the adequacy of the warnings that accompanied the subject dryer, and has not identified any particular defect or omission with respect to them. Indeed, both during discovery and in response to the instant motion, plaintiff declined to identify the warnings and instructions it believed defendant had failed to properly give: plaintiff's present theory of liability on its failure to warn claim is a mystery. In response to the instant motion, plaintiff again declines to identify any deficiencies in the provided warnings, and argues instead that *defendant* has failed to come forward with "evidence that owners of their dryer

follow the warnings contained within the owner's manual, or that the warnings are reasonable." (Dkt. #27 at 11).

Plaintiff's attempt to shift the burden of proof to the defendant is unavailing. The ultimate burden to prove "that the absence of an adequate warning proximately caused his [or her] injury" rests with plaintiff. *Anderson*, 44 F. Supp. 2d 534 at 539. In so doing, plaintiff must "adduce proof that had a [sufficient] warning been provided, [the consumer] would have read the warning and heeded it." *Ramos*, 2008 U.S. Dist. LEXIS 68814 at *43 (quoting *Mulhall v. Hannafin*, 45 A.D.3d 55 (N.Y. App. Div. 1st Dept. 2007)).

Here, plaintiff has not specifically identified a deficiency in the defendant's warnings. For this reason alone, plaintiff's failure to warn claim is subject to dismissal. *See Black v. Covidien, PLC*, 2018 U.S. Dist. LEXIS 13185 (W.D.N.Y. 2018) (dismissing failure to warn claim for failure to state a claim, where plaintiffs failed to identify the warnings given, explain how they were inadequate, or specify what warnings should have been given instead).

To the extent that plaintiff holds to the theory originally espoused in the complaint (but later rejected by plaintiff's experts, and apparently abandoned by plaintiff itself in its responses to the instant motion) – that the dryer fire was caused by the accumulation of lint inside the dryer – plaintiff has failed to adduce any evidence that the warnings provided by defendant in that regard were insufficient. Defendant has produced the product literature that accompanied the subject dryer at the time of sale. It includes prominent warnings that the interior of the dryer should be professionally serviced every 18 months to prevent excessive lint build-up, because such build-up "could result in inefficient drying and possible fire." (Dkt. #25-11 at 157).

It is undisputed, and Stetson confirmed at her deposition, that she received and read the warnings and understood that lint was combustible, but had never had the dryer serviced to remove

11

interior lint. (Dkt. #25-11 at 7-9). Plaintiff offers no evidence that consumers in general, or Stetson in particular, misunderstood the warnings provided by defendant, or that Stetson would have better appreciated the fire hazard posed by accumulated lint inside the dryer, and been compelled to act differently, had the warning been modified in some way.

Because plaintiff's allegations concerning a deficiency in defendant's warnings lack both specificity and supporting evidence, they are little more than bare conclusions of law, which the Court need not accept. Plaintiff's negligence and strict liability claims, as premised upon a failure to warn, are therefore dismissed.

### C. **Breach of Warranty**

Defendant argues that plaintiff's breach of express and implied warranty claims should also be dismissed, on the grounds that they are untimely. Specifically, the statute of limitations on a breach of warranty claim is four years, and accrues on the date the product was delivered. Here, the dryer at issue was manufactured in March 2008, and became Stetson's property when she purchased the home in which it had been installed, in 2008. Because the subject fire took place December 14, 2015 – some 7-8 years after the dryer was delivered, the breach of warranty claim is manifestly untimely. It is therefore dismissed.

## CONCLUSION

For the foregoing reasons, defendant's motion to exclude the testimony of expert witness Arthur Bronstein, and for summary judgment dismissing the complaint (Dkt. #25) is granted.

Bronstein's proffered testimony is excluded, and the complaint is dismissed in its entirety, with prejudice.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
February 18, 2020.